UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____

IN THE MATTER OF
THE EXTRADITION OF
RODNEY MERVYN NICHOLS
_____/

FILED BY_____ABM_____D.C.

Jul 24, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information
and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligation to
Canada.

2.      There is an extradition treaty in force between the United States and Canada, the
Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971,
27 U.S.T. 983, *as amended by* the Protocol Amending the Extradition Treaty with Canada, U.S.-
Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), *and* the Second Protocol Amending the
Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002)
(collectively, "the Treaty").

3.      Pursuant to the Treaty, the Government of Canada has submitted a formal request
through diplomatic channels for the extradition of Rodney Mervyn NICHOLS (NICHOLS).

4.      According to the information provided by the Government of Canada, NICHOLS
was charged with one count of murder, in violation of Section 218(2) of the Criminal Code of
Canada.

5.      This offense was committed within the jurisdiction of Canada.  A warrant for NICHOLS's arrest was issued on September 8, 2022, by Justice Julianne Parfett of the Superior Court of Justice, Ottawa, Ontario.

6.      The warrant was issued on the basis of the following facts:

a.  In or around April 1975, Lalla Jewel Langford (Langford), then forty-eight years old, left her home in Tennessee and drove to Montreal, Quebec, where she moved into a house with her boyfriend, NICHOLS, then thirty-two years old.

b.  Langford was last heard from on April 22, 1975.  On June 4, 1975, Langford's friend reported her missing to the Montreal Police Service (MPS).  At the time of her disappearance, Langford's belongings, including her Cadillac, remained at her home in Montreal.

c.  The MPS investigated Langford's disappearance, but they were unable to locate her or to bring charges regarding her disappearance.

d.  On May 3, 1975, Canadian authorities discovered the body of a then-unidentified female (the "Victim") floating face down in the Nation River in Ontario, Canada. The Victim was partially nude, her hands and feet were bound with neckties, a twenty-four-inch piece of black plastic-covered coaxial cable wire was loosely around her neck, and her head was covered by a handcloth, a towel, and a tablecloth, which were knotted tightly around her neck.  An autopsy conducted by Canadian authorities on May 4, 1975, revealed two fracture injuries to the Victim's larynx, and a Coroner's report, dated September 3, 1975, concluded that the Victim's cause of death was strangulation by ligature of the neck.  The presence of swelling of the wrists around the ligatures suggested to Canadian authorities that the Victim was alive when her wrists and ankles were tied.  Further, the absence of water in the Victim's lungs suggested to Canadian authorities

that she was deceased before entering the water.

e.  On June 7, 1975, an MPS investigator interviewed NICHOLS at the home he shared with Langford in Montreal, Quebec, and NICHOLS provided a voluntary statement. At the time, Canadian authorities did not consider NICHOLS a suspect. During this interview, NICHOLS told the investigator the following, among other things:  NICHOLS arrived home one night and found Langford intoxicated. She complained that she was tired of being alone and told him that she was going to take a trip on her own across Canada. NICHOLS took her wallet and vehicle keys to prevent her from leaving and, when he did so, he saw the date of birth on her driver's license and realized that she was much older than he had presumed. This worsened the dispute, but he went to bed. When he returned home from work the next day, Langford was gone. Then, in early June 1975, NICHOLS received a telephone call from Langford, and she told him that she was in Vancouver, British Columbia. Langford asked him to join her there, but he refused, and Langford told him she would return to Montreal for his birthday, which was the following week. The investigator followed up with NICHOLS on June 12, 1975, at which time NICHOLS stated that he had not heard from Langford since their last telephone conversation.

f.  The identity of the Victim remained unknown for more than forty years, due to the unavailability of DNA evidence. In 2011, Canadian authorities conducted forensic analysis of items found on the Victim's body, including two large, blood-stained pieces of green cloth that covered the Victim's face and neck area when her body was discovered in the Nation River. A partial male DNA profile was found in the bloodstains on the cloth. Subsequently, the Ontario Provincial Police (OPP) collected DNA samples from nine male persons of interest and compared each of these samples with the partial male DNA profile found on the green cloth, and each person

of interest was excluded as the source of the DNA.

g.  On July 26, 2018, Canadian authorities exhumed the body of the Victim from a cemetery in Toronto, under the authority of a Coroner's Warrant.  The next day, a forensic anthropologist from the Ontario Centre of Forensic Science (CFS) conducted a preliminary post-mortem and took a DNA sample from the Victim.  Subsequently, following assistance from the DNA Doe Project and with police-to-police assistance from the U.S. Federal Bureau of Investigation (FBI), the OPP lawfully obtained consent DNA samples from several members of Langford's extended family.  The CFS then compared the DNA samples obtained from Langford's relatives with the newly acquired DNA sample obtained from the exhumed body of the Victim. On July 13, 2021, the Ontario Provincial Forensic Pathology Unit positively identified the Victim as Langford.  Because Langford's body was discovered on May 3, 1975, approximately one month before NICHOLS's alleged telephone conversation with Langford from Vancouver in early June 1975, the OPP concluded that NICHOLS deliberately misled investigators during his interview on June 7, 1975.  Canadian authorities, with the assistance of the FBI, subsequently undertook efforts to locate NICHOLS.   In 2021, Canadian authorities located NICHOLS at the North-Lake Retirement Home in Hollywood, Florida.

h.  On February 1, 2022, OPP investigators traveled to Florida and interviewed NICHOLS at the North-Lake Retirement Home, in the presence of the FBI.  NICHOLS was advised that he was speaking to police regarding the disappearance and murder of Langford. NICHOLS initially denied any involvement in Langford's disappearance.  Subsequently, the interviewer told NICHOLS that the body discovered in the Nation River had been identified as Langford.  NICHOLS then stated that he and Langford had taken a sailboat, that the boat capsized

and that Langford drowned as a result. NICHOLS subsequently stated that he tried to drown Langford in the Ottawa River because he was depressed. When NICHOLS was shown photographs of the neckties that had been used to bind Langford's hands and ankles, he identified the neckties as belonging to him. Canadian authorities then advised NICHOLS that he had admitted to the murder of LANGFORD and that he could be charged. Following a telephone consultation with a legal aid lawyer in Canada, NICHOLS then stated that he had an altercation with LANGFORD that started in his home in Montreal, and that he subsequently dumped her body in the Nation River. He stated that he could not recall why he used the coaxial cable and indicated that no one else was present during the altercation. He stated that he felt terrible for what he had done. When NICHOLS was shown photographs of the items that had been found wrapped around the body of Langford, including two dish towels, a towel with a flower print, and a green blanket, NICHOLS indicated that he did not recognize them but agreed that the items had been from his home. When the OPP investigator asked why he confessed, NICHOLS stated that he "had to come clean."

      i.   According to Canadian authorities, NICHOLS recently developed cognitive and memory issues, as reported by his Power of Attorney. OPP investigators were aware of this and, as such, conducted a routine assessment of NICHOLS's mental capacity during the interview on February 1, 2022. The results of this assessment indicated to Canadian authorities that NICHOLS was verbal and able to engage in conversation, and that he demonstrated accurate recall, as, for example, when he corrected the interviewing officer regarding the name of his former rugby club and criticized the lunch he had just eaten.

      j.   During his February 1, 2022, interview, NICHOLS provided a voluntary sample of

his DNA to OPP officers. His DNA sample was submitted to the CFS for analysis and was compared to the partial male DNA profile that was collected in 2011 from the blood on the green cloth that was wrapped around Langford's face and neck. On February 15, 2022, the CFS issued a report concluding that the partial DNA from the blood on the green cloth that covered Langford's neck is 190 times more likely to be NICHOLS's DNA than the DNA of any other person unrelated to NICHOLS.

       k.   In an affidavit dated September 13, 2022, a Detective Constable with the OPP identified photographs of NICHOLS as the individual who was interviewed by Canadian authorities on February 1, 2022.

       7.   NICHOLS may be found within the jurisdiction of this Court at the North-Lake Retirement Home at 1222 N. 16th Avenue, Hollywood, FL 33020.

       8.   Tom Heinemann, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty, stating that the offense for which extradition is demanded is provided for by the Treaty, and confirming that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in Canada, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence.

       9.   The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from Canada, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this complaint and incorporated by reference herein.

10.     NICHOLS would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Canada, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

LAWRENCE D. LaVECCHIO
Assistant United States Attorney

Sworn to subscribed before me on

this 24ᵗʰ day of July 2023 at Ft. Lauderdale, Florida.

JARED M. STRAUSS
United States Magistrate Judge