UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____

IN THE MATTER OF
THE EXTRADITION OF
RODNEY MERVYN NICHOLS

_____/

FILED BY___ABM___D.C.

Jul 24, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## MEMORANDUM OF EXTRADITION LAW AND REQUEST
## FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations and acting at the request of the Government of Canada, respectfully requests that the fugitive in this case, Rodney Mervyn NICHOLS (NICHOLS), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*.  This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why NICHOLS should be detained.  In short, NICHOLS should be detained because he cannot overcome the strong presumption against bail in international extradition cases.  Specifically, he cannot meet his burden of showing that he is not a flight risk, that he is not a danger to the community, and that special circumstances warrant his release.

**BACKGROUND**

Canada seeks NICHOLS's extradition to be prosecuted for murder, in violation of Section 218(2) of the Criminal Code of Canada.  A warrant for NICHOLS's arrest was issued on September 8, 2022, by Justice Julianne Parfett of the Superior Court of Justice, Ottawa, Ontario. The extradition request presents the following facts, among others, as the basis for the Canada's extradition request.

In or around April 1975, Lalla Jewel Langford (Langford), then forty-eight years old, left

her home in Tennessee and drove to Montreal, Quebec, where she moved into a house with her boyfriend, NICHOLS, then thirty-two years old.

Langford was last heard from on April 22, 1975.  On June 4, 1975, Langford's friend reported her missing to the Montreal Police Service (MPS).  At the time of her disappearance, Langford's belongings, including her Cadillac, remained at her home in Montreal.  The MPS investigated Langford's disappearance, but they were unable to locate her or to bring charges regarding her disappearance.

On May 3, 1975, Canadian authorities discovered the body of a then-unidentified female (the "Victim") floating face down in the Nation River in Ontario, Canada.  The Victim was partially nude, her hands and feet were bound with neckties, a twenty-four-inch piece of black plastic-covered coaxial cable wire was loosely around her neck, and her head was covered by a handcloth, a towel, and a tablecloth, which were knotted tightly around her neck.  An autopsy conducted by Canadian authorities on May 4, 1975, revealed two fracture injuries to the Victim's larynx, and a Coroner's report, dated September 3, 1975, concluded that the Victim's cause of death was strangulation by ligature of the neck.  The presence of swelling of the wrists around the ligatures suggested to Canadian authorities that the Victim was alive when her wrists and ankles were tied.  Further, the absence of water in the Victim's lungs suggested to Canadian authorities that she was deceased before entering the water.

On June 7, 1975, an MPS investigator interviewed NICHOLS at the home he shared with Langford in Montreal, Quebec, and NICHOLS provided a voluntary statement.  At the time, Canadian authorities did not consider NICHOLS a suspect.  During this interview, NICHOLS told the investigator the following, among other things:  NICHOLS arrived home one night and found

Langford intoxicated.  She complained that she was tired of being alone and told him that she was going to take a trip on her own across Canada.  NICHOLS took her wallet and vehicle keys to prevent her from leaving and, when he did so, he saw the date of birth on her driver's license and realized that she was much older than he had presumed.  This worsened the dispute, but he went to bed.  When he returned home from work the next day, Langford was gone.  Then, in early June 1975, NICHOLS received a telephone call from Langford, and she told him that she was in Vancouver, British Columbia.  Langford asked him to join her there, but he refused, and Langford told him she would return to Montreal for his birthday, which was the following week.  The investigator followed up with NICHOLS on June 12, 1975, at which time NICHOLS stated that he had not heard from Langford since their last telephone conversation.

The identity of the Victim remained unknown for more than forty years, due to the unavailability of DNA evidence.  In 2011, Canadian authorities conducted forensic analysis of items found on the Victim's body, including two large, blood-stained pieces of green cloth that covered the Victim's face and neck area when her body was discovered in the Nation River.  A partial male DNA profile was found in the bloodstains on the cloth.  Subsequently, the Ontario Provincial Police (OPP) collected DNA samples from nine male persons of interest and compared each of these samples with the partial male DNA profile found on the green cloth, and each person of interest was excluded as the source of the DNA.

On July 26, 2018, Canadian authorities exhumed the body of the Victim from a cemetery in Toronto, under the authority of a Coroner's Warrant.  The next day, a forensic anthropologist from the Ontario Centre of Forensic Science (CFS) conducted a preliminary post-mortem and took a DNA sample from the Victim.  Subsequently, following assistance from the DNA Doe Project

and with police-to-police assistance from the U.S. Federal Bureau of Investigation (FBI), the OPP lawfully obtained consent DNA samples from several members of Langford's extended family. The CFS then compared the DNA samples obtained from Langford's relatives with the newly acquired DNA sample obtained from the exhumed body of the Victim. On July 13, 2021, the Ontario Provincial Forensic Pathology Unit positively identified the Victim as Langford. Because Langford's body was discovered on May 3, 1975, approximately one month before NICHOLS's alleged telephone conversation with Langford from Vancouver in early June 1975, the OPP concluded that NICHOLS deliberately misled investigators during his interview on June 7, 1975. Canadian authorities, with the assistance of the FBI, subsequently undertook efforts to locate NICHOLS. In 2021, Canadian authorities located NICHOLS at the North-Lake Retirement Home in Hollywood, Florida.

On February 1, 2022, OPP investigators traveled to Florida and interviewed NICHOLS at the North-Lake Retirement Home, in the presence of the FBI. NICHOLS was advised that he was speaking to police regarding the disappearance and murder of Langford. NICHOLS initially denied any involvement in Langford's disappearance. Subsequently, the interviewer told NICHOLS that the body discovered in the Nation River had been identified as Langford. NICHOLS then stated that he and Langford had taken a sailboat, and the boat capsized and Langford drowned as a result. NICHOLS subsequently stated that he tried to drown Langford in the Ottawa River because he was depressed. When NICHOLS was shown photographs of the neckties that had been used to bind Langford's hands and ankles, he identified the neckties as belonging to him. Canadian authorities then advised NICHOLS that he had admitted to the murder of LANGFORD and that he could be charged. Following a telephone consultation with a legal aid

4

lawyer in Canada, NICHOLS then stated that he had an altercation with LANGFORD that started in his home in Montreal, and that he subsequently dumped her body in the Nation River. He stated that he could not recall why he used the coaxial cable and indicated that no one else was present during the altercation. He stated that he felt terrible for what he had done. When NICHOLS was shown photographs of the items that had been found wrapped around the body of Langford, including two dish towels, a towel with a flower print, and a green blanket, NICHOLS indicated that he did not recognize them but agreed that the items had been from his home. When the OPP investigator asked why he confessed, NICHOLS stated that he "had to come clean."

According to Canadian authorities, NICHOLS recently developed cognitive and memory issues, as reported by his Power of Attorney. OPP investigators were aware of this and, as such, conducted a routine assessment of NICHOLS's mental capacity during the interview on February 1, 2022. The results of this assessment indicated to Canadian authorities that NICHOLS was verbal and able to engage in conversation, and that he demonstrated accurate recall, as, for example, when he corrected the interviewing officer regarding the name of his former rugby club and criticized the lunch he had just eaten.

During his February 1, 2022, interview, NICHOLS provided a voluntary sample of his DNA to OPP officers. His DNA sample was submitted to the CFS for analysis and was compared to the partial male DNA profile that was collected in 2011 from the blood on the green cloth that was wrapped around Langford's face and neck. On February 15, 2022, the CFS issued a report concluding that the partial DNA from the blood on the green cloth that covered Langford's neck is 190 times more likely to be NICHOLS's DNA than the DNA of any other person unrelated to NICHOLS.

In an affidavit dated September 13, 2022, a Detective Constable with the OPP identified photographs of NICHOLS as the individual who was interviewed by Canadian authorities on February 1, 2022.

Accordingly, Canada has sought NICHOLS's extradition, pursuant to its extradition treaty with the United States.[1]  The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for NICHOLS's arrest.

**APPLICABLE LAW**

**I.      LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS**

**A.      The limited role of the Court in extradition proceedings**

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*, 365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004).  The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence,

---

[1] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* the Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), *and* the Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (collectively, "the Treaty").

and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

**B.    The requirements for certification**

The Court must certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See, e.g.*, *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015). The following sections briefly discuss each of those requirements.

1.     Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). This District's local rules expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." *See* Rule 1(a)(3), Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida.

2.     Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as NICHOLS, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3.     Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Arias v. Warden*, 928 F.3d 1281, 1285 (11th Cir. July 8, 2019); *Kastnerova*, 365 F.3d at 987. The government will satisfy this requirement at the extradition hearing by offering

into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Canada.  The Court must defer to the Department of State's determination in that regard. *E.g.*, *Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the Treaty remains in full force," courts "have no answer but this: the Treaty remains in effect").

### 4.   Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article 1 of the U.S.-Canada Treaty provides for the return of fugitives who have been charged with, or convicted of, an offense covered by Article 2 of the Treaty that is committed within the territory of the requesting country.  Article 2 of the Treaty defines offenses as extraditable if the alleged conduct is punishable under the laws of both the United States and Canada by "imprisonment or other form of detention for a term exceeding one year or any greater punishment."

In assessing whether the crimes for which extradition is requested meet the Treaty's dual criminality requirement, the Court should examine the description of criminal conduct provided by Canada in support of its charges and decide whether that conduct, had it been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  *See Arias*, 928 F.3d at 1292-93 (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, at *3 (M.D. Fla. May 10, 2005) ("Acts are

considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citation omitted). A requesting country need not establish that its crimes are identical to ours. Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933); *see also, e.g., Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5.    Probable cause that the fugitive has committed the offenses

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Canada were committed by the person before the Court. *E.g., Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111

10

(1975) (internal quotation marks and citation omitted).  The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based."  *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quotations omitted); *see Martinelli Berrocal*, 2017 WL 3776953, at *21 (same).

### C.      An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court.  *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  Accordingly, an extradition hearing is not a criminal proceeding.  *See, e.g.*, *Martin*, 993 F.2d at 828.  Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *see In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Accordingly, the Federal Rules of Evidence do not apply to extradition proceedings.  *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").  Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, "[a] certification of extradition may be and usually is based

entirely on the authenticated documentary evidence and information provided by the requesting government." *Shaw*, 2015 WL 3442022, at *4; *see also, e.g.*, *Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317). Nothing more is required, and typically nothing more is provided. *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) (police detective's statement summarizing results of investigation established probable cause); *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); *Afanasjev*, 418 F.3d at 1164-65. A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Nunez-Garrido*, 829 F. Supp. 2d at 1282-83 (collecting cases); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Martin*, 993 F.2d at 829; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Batchedler*, 494 F. Supp.

2d 1302, 1309 (N.D. Fla. 2007) ("Double jeopardy has no role at all in an extradition proceeding.") (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. *See, e.g, Nunez-Garrido*, 829 F. Supp. 2d at 1281. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913).  A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . .  This the Defendant cannot do.").  "The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (citing cases); *Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5.  These issues, which require factual or credibility

determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

**D.      Rule of non-inquiry: All matters other than certification are reserved for the Secretary of State**

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court.  *See* 18 U.S.C. §§ 3184, 3186.  For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds.  *Arias*, 928 F.3d at 1295 ("We have neither the power nor competence to consider a foreign fugitive's concern about the fairness of his country's criminal justice system, let alone halt his extradition on that basis— that kind of consideration is properly addressed to the Executive Branch."); *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate.  Rather, humanitarian considerations are matters properly reviewed by the Department of State.") (citation omitted); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted).  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State."  *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.     NICHOLS SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[2]  *See In re Extradition of Shaw*, No. 14-MC-81475-WM, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015).  Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.     Applicable law

1.     <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process.").  The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant,

---

[2] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, NICHOLS is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with an offense in violation of Canadian law.

> and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling.  When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive.  *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62.  It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States.  Such reciprocity would be defeated if a fugitive flees after being released on bond.  *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future.  And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release.  *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *Shaw*, 2015 WL 521183,

16

at *5; *Martinelli Berrocal*, 263 F. Supp. 3d at 1292 (for over a hundred years, the "special circumstances" test has been applied by circuit and district courts for bail determinations in extradition cases).[3] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304-06; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-MJ-430-HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from, and additional to, considerations of danger to the community or risk of flight. *See, e.g.*, *Shaw*, 2015 WL 521183, at *6; *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of

---

[3] "The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. The courts that examine risk of flight and special circumstances separately thus require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community. The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry." *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 (citations and quotation marks omitted).

flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, No. 17-CR-664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

18

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Matter of Extradition of Carr*, 20-CR-370, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020); *Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *Matter of Knotek*, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *Shaw*, 2015 WL 521183, at *8; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

## B.    Analysis

The Court should detain NICHOLS without bond because he is a danger to the community and a flight risk. *First*, the serious nature of the murder offense with which NICHOLS is charged renders him a danger to the community both here in the United States and abroad if he were

released from custody. *See, e.g., Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail").

*Second*, NICHOLS has a strong incentive to flee given the strength of Canada's case, the government's relatively low burden of proof in extradition hearings, and the prospect of serving the rest of his life in prison. *See, e.g., Martinelli Berrocal*, 263 F. Supp. 3d at 1305 (sixty-six years of age and potential twenty-one-year sentence "materially contribute[d] to [the fugitive's] high risk of flight"); *Shaw*, 2015 WL 521183, at *9 ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."); *In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)). Indeed, NICHOLS has already shown incentive to flee by leaving Canada and severing contact with his former Canada-based friends, rugby teammates, and intimate partners after the 1970s.

These reasons alone warrant denying any forthcoming application for bail. However, even if the Court were satisfied that NICHOLS is not a flight risk or danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. *Cf. In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show

a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Canada, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

**CONCLUSION**

For the foregoing reasons, the United States requests that NICHOLS be detained pending resolution of this extradition proceeding.

Dated July 21, 2023

Respectfully submitted,

MARKENZY LAPOINTE
United States Attorney

By:

LAWRENCE D. LaVECCHIO
Assistant United States Attorney
Florida Bar No. 305405
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, FL  33394
Tel. 954-660-5788
Email: lawrence.lavecchio@usdoj.gov