UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 23-MC-61413-UNA/STRAUSS

IN THE MATTER OF
THE EXTRADITION OF
RODNEY MERVYN NICHOLS
_____/

FILED BY ___AT___ D.C.

Oct 2, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

CERTIFICATION FOR EXTRADITION

Having held an extradition hearing on October 2, 2023, and after considering the evidence, in particular, the certified and authenticated documents submitted by the Government of Canada (DE 3-2), and the pleadings and the arguments of counsel, the Court finds and certifies to the Secretary of State as follows:

1. This Court has jurisdiction over, and the undersigned is authorized to conduct, extradition proceedings pursuant to Title 18, United States Code, Section 3184 and Rule 1(a)(3) of the Magistrate Judge Rules in the United States District Court for the Southern District of Florida;

2. This Court has personal jurisdiction over Rodney Mervyn NICHOLS ("Fugitive" or "NICHOLS") who was found and arrested on July 25, 2023 in this District pursuant to a complaint filed by the United States in response to the request of Government of Canada for the arrest and extradition of the Fugitive;

3. The extradition treaty between the United States and the Government of Canada, 27 U.S.T. 983, as amended by the Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), and the Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11

(2002) (collectively, "the Treaty") was first entered into force on December 3, 1971, and was in full force and effect at all times relevant to this action;

4. The Rodney Mervyn NICHOLS sought by the Canadian authorities and the Rodney Mervyn NICHOLS arrested in this District for extradition and brought before this Court are one and the same person;

5. The Fugitive has been charged in Canada with one count of murder, in violation of Section 218(2) of the Criminal Code of Canada. The Government of Canada has jurisdiction over this criminal conduct;

6. The above referenced Treaty between the United States and Canada encompasses the offense for which the Fugitive has been charged and for which extradition is sought for trial;

7. The Government of Canada submitted documents that were properly authenticated and certified in accordance with the terms of the Treaty. Those documents include the pertinent text for the crime with which the Fugitive has been charged;

8. There is probable cause to believe that the Fugitive before this Court, the same person identified in the extradition request from the Government of Canada, committed the offense for which extradition is sought;

9. The evidence before this Court is sufficient to establish that the conduct for which the Fugitive is sought, that being murder, constitutes an offense punishable by the laws of Canada and the United States by imprisonment or other form of detention exceeding one year. This finding rests upon the documents submitted by the Government of Canada in this matter, including the following facts:

   a. In or around April 1975, Lalla Jewel Langford (Langford), then forty-eight years old, left her home in Tennessee and drove to Montreal, Quebec, where she moved into a

house with her boyfriend, NICHOLS, then thirty-two years old.

b.      Langford was last heard from on April 22, 1975.  On June 4, 1975, Langford's friend reported her missing to the Montreal Police Service (MPS).  At the time of her disappearance, Langford's belongings, including her Cadillac, remained at her home in Montreal.

c.      The MPS investigated Langford's disappearance, but they were unable to locate her or to bring charges regarding her disappearance.

d.      On May 3, 1975, Canadian authorities discovered the body of a then-unidentified female (the "Victim") floating face down in the Nation River in Ontario, Canada.  The Victim was partially nude, her hands and feet were bound with neckties, a twenty-four-inch piece of black plastic-covered coaxial cable wire was loosely around her neck, and her head was covered by a handcloth, a towel, and a tablecloth, which were knotted tightly around her neck.  An autopsy conducted by Canadian authorities on May 4, 1975, revealed two fracture injuries to the Victim's larynx, and a Coroner's report, dated September 3, 1975, concluded that the Victim's cause of death was strangulation by ligature of the neck. The presence of swelling of the wrists around the ligatures suggested to Canadian authorities that the Victim was alive when her wrists and ankles were tied.  Further, the absence of water in the Victim's lungs suggested to Canadian authorities that she was deceased before entering the water.

e.      On June 7, 1975, an MPS investigator interviewed NICHOLS at the home he shared with Langford in Montreal, Quebec, and NICHOLS provided a voluntary statement.  At the time, Canadian authorities did not consider NICHOLS a suspect.  During this interview, NICHOLS told the investigator the following, among other things:   NICHOLS

3

arrived home one night and found Langford intoxicated. She complained that she was tired of being alone and told him that she was going to take a trip on her own across Canada. NICHOLS took her wallet and vehicle keys to prevent her from leaving and, when he did so, he saw the date of birth on her driver's license and realized that she was much older than he had presumed. This worsened the dispute, but he went to bed. When he returned home from work the next day, Langford was gone. Then, in early June 1975, NICHOLS received a telephone call from Langford, and she told him that she was in Vancouver, British Columbia. Langford asked him to join her there, but he refused, and Langford told him she would return to Montreal for his birthday, which was the following week. The investigator followed up with NICHOLS on June 12, 1975, at which time NICHOLS stated that he had not heard from Langford since their last telephone conversation.

f.  The identity of the Victim remained unknown for more than forty years, due to the unavailability of DNA evidence. In 2011, Canadian authorities conducted forensic analysis of items found on the Victim's body, including two large, blood-stained pieces of green cloth that covered the Victim's face and neck area when her body was discovered in the Nation River. A partial male DNA profile was found in the bloodstains on the cloth. Subsequently, the Ontario Provincial Police (OPP) collected DNA samples from nine male persons of interest and compared each of these samples with the partial male DNA profile found on the green cloth, and each person of interest was excluded as the source of the DNA.

g.  On July 26, 2018, Canadian authorities exhumed the body of the Victim from a cemetery in Toronto, under the authority of a Coroner's Warrant. The next day, a forensic anthropologist from the Ontario Centre of Forensic Science (CFS) conducted a preliminary

post-mortem and took a DNA sample from the Victim. Subsequently, following assistance from the DNA Doe Project and with police-to-police assistance from the U.S. Federal Bureau of Investigation (FBI), the OPP lawfully obtained consent DNA samples from several members of Langford's extended family. The CFS then compared the DNA samples obtained from Langford's relatives with the newly acquired DNA sample obtained from the exhumed body of the Victim. On July 13, 2021, the Ontario Provincial Forensic Pathology Unit positively identified the Victim as Langford. Because Langford's body was discovered on May 3, 1975, approximately one month before NICHOLS's alleged telephone conversation with Langford from Vancouver in early June 1975, the OPP concluded that NICHOLS deliberately misled investigators during his interview on June 7, 1975. Canadian authorities, with the assistance of the FBI, subsequently undertook efforts to locate NICHOLS. In 2021, Canadian authorities located NICHOLS at the North-Lake Retirement Home in Hollywood, Florida.

h.   On February 1, 2022, OPP investigators traveled to Florida and interviewed NICHOLS at the North-Lake Retirement Home, in the presence of the FBI. NICHOLS was advised that he was speaking to police regarding the disappearance and murder of Langford. NICHOLS initially denied any involvement in Langford's disappearance. Subsequently, the interviewer told NICHOLS that the body discovered in the Nation River had been identified as Langford. NICHOLS then stated that he and Langford had taken a sailboat, that the boat capsized and that Langford drowned as a result. NICHOLS subsequently stated that he tried to drown Langford in the Ottawa River because he was depressed. When NICHOLS was shown photographs of the neckties that had been used to bind Langford's hands and ankles, he identified the neckties as belonging to him.

5

Canadian authorities then advised NICHOLS that he had admitted to the murder of Langford and that he could be charged. Following a telephone consultation with a legal aid lawyer in Canada, NICHOLS then stated that he had an altercation with Langford that started in his home in Montreal, and that he subsequently dumped her body in the Nation River. He stated that he could not recall why he used the coaxial cable and indicated that no one else was present during the altercation. He stated that he felt terrible for what he had done. When NICHOLS was shown photographs of the items that had been found wrapped around the body of Langford, including two dish towels, a towel with a flower print, and a green blanket, NICHOLS indicated that he did not recognize them but agreed that the items had been from his home. When the OPP investigator asked why he confessed, NICHOLS stated that he "had to come clean."

i.  Nichols had recently developed cognitive and memory issues, as reported by his Power of Attorney. OPP investigators were aware of this and, as such, conducted a routine assessment of Nichols' mental capacity during the interview on February 1, 2022. The results of this assessment show that Nichols was verbal and able to engage in conversation, and demonstrate accurate recall, as for example, when he corrected the interviewing officer in relation to the name of his former rugby club, and criticized the lunch he had just eaten.

j.  During his February 1, 2022, interview, NICHOLS provided a voluntary sample of his DNA to OPP officers. His DNA sample was submitted to the CFS for analysis and was compared to the partial male DNA profile that was collected in 2011 from the blood on the green cloth that was wrapped around Langford's face and neck. On February 15, 2022, the CFS issued a report concluding that the partial DNA from the blood on the green

cloth that covered Langford's neck is 190 times more likely to be NICHOLS's DNA than the DNA of any other person unrelated to NICHOLS.

THEREFORE, pursuant to 18 U.S.C. § 3184, and the above findings, I certify the extradition of the Fugitive, Rodney Mervyn NICHOLS, to Canada, on all offenses for which extradition was requested. The Fugitive shall surrender to the custody of the United States Marshal on when directed by the United States Marshal pending further decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. § 3186.

I further order that the Clerk of this Court forward a certified copy of this Certification for Extradition, together with a copy of the evidence presented in this case, including the formal extradition documents received in evidence and any testimony received in this case, to the Secretary of State.

DATED: October 2, 2023

_____
JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE